Based upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence AFFIRMS IN PART and MODIFIES IN PART the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties through the Pre-trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff and defendant-employer at all relevant times.
3. The named employer is self-insured and Key Risk Management Services is the servicing agent.
4. The employee sustained a compensable occupational disease, carpal tunnel syndrome, on or about November 4, 1994. Although the defendant have not filed an I.C. Form 21 or Form 60, the defendant are not contesting the compensability of the claim, and the only controversy is how much compensation plaintiff is due.
6. The issues for determination by the Commission are:
a. What is the plaintiff's correct average weekly wage? The parties have submitted a Form 22 as well as other wage information and testimony on this issue.
b. Whether plaintiff is entitled to temporary partial compensation during the period from March 2, 1995 to September 10, 1995?
c. Whether plaintiff is able to continue jobs assigned by the employer?
d. Plaintiff requests a second opinion regarding disability (which was subsequently rendered by Dr. Habashi).
e. What, if any, additional compensation is due?
7. Plaintiff changed jobs, from being a sock boarder to a floating boarder on September 11, 1995.
8. On June 24, 1996, plaintiff moved to a job in the packing department.
***********
Based upon all of the competent evidence of record, the Full Commission adopts in part and modifies in part the findings of fact of the deputy commissioner as follows:
 FINDINGS OF FACT
1. Plaintiff is a female who was born on February 10, 1949. She quit school in the tenth grade, but subsequently received her G.E.D. She began working for defendant-employer in November, 1987, operating a sock boarding machine. She was continuing to do this job at the time she was diagnosed with carpal tunnel syndrome in October, 1994.
2. Plaintiff sustained a prior compensable workers' compensation injury around November 15, 1991, giving rise to T.M.J. syndrome on the right side and neck pain along the right paraspinal region behind her ear, radiating into the trapezius on the right side, but not beyond the right shoulder joint. This injury resulted in surgery in May, 1992, by Dr. Christopher Brown for reconstruction of her right temporomandibular joint. These injuries are not the subject of this claim, and are only relevant as they may concern plaintiff's average weekly wage or any periods during which compensation may be due.
3. Plaintiff was referred to Dr. Mark J. Marchese, a neurosurgeon, by Ms. Eleanor Talley in behalf of the defendant-carrier for her prior injury to evaluate plaintiff's continuing neck pain resulting from her work-related injury of November, 1991. When Dr. Marchese first saw plaintiff October 11, 1994, plaintiff was also complaining of numbness and tingling in both hands. Dr. Marchese suspected carpal tunnel syndrome, and ordered nerve conduction studies, which were done on November 7, 1994. As a result of these studies, Dr. Marchese concluded that plaintiff's neck condition was actually contributing very little to plaintiff's pain, but that plaintiff's carpal tunnel condition was a major contributing factor to her pain. Nevertheless, Dr. Marchese felt that plaintiff's carpal tunnel syndrome was quite mild and would not respond well to surgery. Dr. Marchese was familiar with plaintiff's sock boarding job, which required repetitive hand movements and he suggested to plaintiff that a job change would be prudent. He advised her that she should consider vocational retraining.
4. Plaintiff had experienced numbness in her hands and wrists for almost two years prior to seeing Dr. Marchese on October 11, 1994; however, her hands and wrists had progressively gotten worse. As a result of the condition of her hands and wrists and to a lesser extent, her neck pain and T.M.J. syndrome, plaintiff's production was down some days by about 33 1/3 percent. This caused a decrease in her average weekly wage after the defendant-employer terminated their supplement to her May 4, 1995.
5. Plaintiff's only real job experience was in sock boarding and she was not interested in changing jobs or in vocational retraining since the sock-boarding job was one of the best-paying jobs available to her with the defendant-employer. Despite the recommendation of Dr. Marchese, and any discomfort she may have been experiencing at that time, plaintiff continued in the position of sock boarding.
6. Plaintiff again saw Dr. Marchese June 7, 1995, with continued complaints of numbness in both hands. Dr. Marchese reviewed job descriptions for two positions, a seam operator and a knitter. The knitter was a non-production job which Dr. Marchese believed was a better option for plaintiff. He again suggested that she consider vocational retraining.
7. On September 11, 1995, plaintiff changed from the sock boarding job to the position of floating boarder, based upon the September 6, 1995 recommendation of Dr. Marchese and her continuing hand and wrist pain. Her hourly wage as a sock boarder was $9.62, and her hourly wage as a floater was $7.75.
8. Although her carpal tunnel syndrome was diagnosed almost a year earlier in October, 1994, plaintiff was not forced to change jobs due to her carpal tunnel syndrome and did not actually suffer any diminution in her wage-earning capacity due to that condition until September 11, 1995 when she changed to the floating boarder position. During part of the preceding year, defendant had elected to supplement plaintiff's salary to equal her wages as if she were meeting production. During the time plaintiff was receiving a salary supplement, plaintiff had not been released from her doctor's care for her admittedly compensable T.M.J. condition. Plaintiff was apparently paid a salary supplement in lieu of partial disability due to her admittedly compensable T.M.J. claim.
9. It would not be fair to use the actual wages (without salary supplement) earned by plaintiff during the preceding year (September 11, 1994 to September 10, 1995) to compute plaintiff's average weekly wage as of September 10, 1995. Plaintiff was partially disabled during part of that prior year due to T.M.J., neck pain and hand and wrist pain. Consequently, her ability to work and make production was diminished. Methods two, three and four for computing average weekly wages would also not produce fair results for either party.
10. The fifth statutory method of computing average weekly wages is fairer to both parties. Prior to her admittedly compensable T.M.J. injury, plaintiff earned an average of $9.62 per hour. As a result of T.M.J. and neck pain, plaintiff's earning capacity was reduced, but the defendant elected to continue to pay her the amount she most likely would have earned were it not for her T.M.J. injury through March 2, 1995. Therefore, all of the wages plaintiff received (including guaranteed wages) during the period from September 11, 1994 through March 2, 1995 should be used to calculate her average weekly wages. It is fairer to both parties to use plaintiff's actual wages from March 3, 1995 through September 10, 1995.
11. Plaintiff's average weekly wage was $403.86 which yields a compensation rate of $269.24.
12. Plaintiff continued to experience problems in the floating boarder position and on or about May 6, 1996, plaintiff was moved from that job to a position in the repack department. The first job she was assigned involved lifting boxes of socks onto a scale. On June 24, 1996, plaintiff changed to a different job in the packing department. In this position, she gathered up packing materials such as bands and tickets and carried them along with work orders to the employees doing the packing. The hand movements required in this new position were not as repetitive or forceful as in plaintiff's previous positions in boarding and repacking. Although plaintiff continued to have hand discomfort, the job bothered her less than the boarding or repacking jobs. Although she continued to experience difficulties with her hands, plaintiff was able to do this job.
13. Dr. Marchese saw plaintiff in follow-up on April 3, 1996. Her symptoms at that time continued to be mild in nature, and Dr. Marchese believed she was at maximum medical improvement, with no need for surgery. He assessed her with a five percent permanent impairment of each hand, and released her from his care.
14. Plaintiff saw Dr. Marchese again on September 24, 1996. Dr. Marchese found plaintiff's physical symptoms largely unchanged with mild Tinel's signs of both wrists. A nerve conduction study done on October 14, 1996 was not significantly different from that of November 7, 1994, and his assessment continues to be mild carpal tunnel syndrome. Dr. Marchese is of the opinion that plaintiff can continue to work as her discomfort may allow, although ideally he would recommend vocational retraining.
15. Plaintiff has also been evaluated for purposes of a permanency rating by Dr. Maher Habashi, who saw her once on November 11, 1996. It is his opinion that plaintiff has a ten percent permanent impairment of each hand, even though plaintiff has not had surgery.
16. In weighing the evidence of any permanent impairment, the undersigned give more weight to the opinion of Dr. Marchese since he is plaintiff's treating physician and has seen her on more than one occasion. As the treating physician, who has followed her for more than two years, Dr. Marchese is in a better position to assess any permanent damage to plaintiff's hands, and to determine any necessary work restrictions.
17. Although the ideal would be for plaintiff to seek vocational retraining to totally remove her from any repetitive motion positions, the evidence establishes that plaintiff was and is able to continue to work for defendant-employer. Although she earns less wages than in her previous position, plaintiff was and is capable of performing the job in the packing department, which does not require repetitive or strenuous hand motions.
18. Plaintiff is not able to continue in a production position such as sock boarding. From the time she was moved from the floating boarder position on September 11, 1995 and continuing through the completion of the evidence before the deputy commissioner, plaintiff has suffered a diminution of her wage-earning capacity due to her carpal tunnel syndrome.
19. Defendant failed or refused to file an admission of liability on a Form 21 or Form 60 even though they do not contest the claim. Although the Full Commission does not condone defendant's conduct in this case, the Full Commission is not assessing sanctions in this case as plaintiff has continued to work and there was a disputed issue concerning the average weekly wage due plaintiff and what amount of partial disability is due the plaintiff.
***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's average weekly wage for purposes of this claim should be based upon the wages earned and the salary supplement received during the 52 weeks preceding September 11, 1995, the date of the onset of the diminution of her wage earning capacity due to carpal tunnel syndrome. This method of calculation yields an average weekly wage of $403.86, and a compensation rate of $269.24. This fifth method of computing average weekly wages is fairer to both parties. Methods one through four under N.C. Gen. Stat. § 97-2(5) are rejected as these calculation methods are either inapplicable or would not produce results which are fair to both parties.
2. As a result of her repetitive use of her hands and wrists in her employment, plaintiff developed carpal tunnel syndrome, an occupational disease which was due to causes and conditions characteristic of and peculiar to her employment and not an ordinary disease of life to which the general public is equally exposed outside of plaintiff's employment. N.C. Gen. Stat. §97-53(13).
3. Due to her carpal tunnel syndrome, plaintiff has sustained a diminution of her wage earning capacity effective September 11, 1995, and would be entitled to partial disability benefits beginning September 11, 1995, and continuing so long as she continues to be partially disabled up to a maximum of 300 weeks pursuant to N.C. Gen. Stat. § 97-30, if she elects benefits under this statute.
4. Plaintiff has sustained a five percent permanent impairment to each hand for which she would be entitled to benefits at the rate of $269.24 per week for a total of 20 weeks pursuant to N.C. Gen. Stat. § 97-31(12), if she elects benefits under this statute.
5. Plaintiff is entitled to elect the more favorable remedy between her partial benefits under N.C. Gen. Stat. § 97-30
and the permanent partial ratings to each hand under N.C. Gen. Stat. § 97-31(12). The more favorable remedy would appear to be the ongoing partial disability benefits. Gupton v.Builders Transport, 320 N.C. 38 (1987).
6. Plaintiff is entitled to have defendant provide all medical compensation reasonably necessary as a result of her occupational disease to the extent it tends to effect a cure, give relief or lessen her disability. N.C. Gen. Stat. §§ 97-25; 97-2(19).
7. In its discretion the Full Commission is declining to assess sanctions against defendant for noncompliance with N.C. Gen. Stat. § 97-18(b) and Industrial Commission Rule 601.
***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay plaintiff compensation at the rate of sixty-six and two-thirds percent of the difference between her average weekly wage of $403.86 as of September 10, 1995 and such wages as she may be earning thereafter beginning September 11, 1995 and continuing for so long as plaintiff remains partially disabled up to a maximum of 300 weeks.
2. Defendant shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her compensable carpal tunnel syndrome, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, or give relief or may tend to lessen the plaintiff's period of disability, when bills for same have been submitted and approved in accordance with procedures established by the Industrial Commission.
3. A reasonable attorney fee of twenty-five percent of the compensation due plaintiff under paragraph one of this Award is approved for plaintiff's counsel and shall be paid as follows: twenty-five percent of the lump sum due plaintiff under paragraph one of this Award shall be deducted from the sum to be paid the plaintiff and shall be paid directly to plaintiff's counsel; and, thereafter, plaintiff's counsel shall directly receive every fourth check due plaintiff.
4. Defendant shall pay the costs.
 S/_____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_____________ J. HOWARD BUNN, Jr. CHAIRMAN
S/_____________ CHRISTOPHER SCOTT COMMISSIONER